OPINION OF THE COURT
Richard W. Wallach, J.
Consideration of this motion to dismiss for failure to state a claim and for lack of standing calls for a rational appreciation of the ultimate limits and workings of the three major branches of government.
This action is brought by plaintiff RAM, an unincorporated association all of whose members are recipients of public assistance, and by 14 individual welfare recipients, to challenge on a constitutional basis the adequacy of the welfare payment levels provided by section 131-a of the Social Services Law. Defendant Blum is sued individually and as Commissioner of the Department of Social Services. The amended complaint demands the following declaratory and injunctive relief:
(1) a declaration that section 131-a of the Social Services Law violates article XVII of the New York State Constitution and the due process clauses of the United States Constitution because it lacks "a mechanism” to adjust welfare benefits upwards with the inflation rate to meet subsistence needs;
(2) a declaration that Social Services officials have a duty under subdivision 1 of section 62 of the Social Services Law to provide public assistance at a subsistence level and that defendant has violated her legal duty by failing to do so; and
(3) an appropriate injunction to give full force and effect to the foregoing.
I.
Although the action is pleaded in 111 separate paragraphs and supported by voluminous affidavits and exhibits, the fundamental theme of the suit is the simple charge that the legislature has failed to discharge its duty under article XVII of the State Constitution. That article provides: "The aid, care and support of the needy are public concerns and shall be provided by the state and by such of its subdivisions, and in such manner and by such means, as the legislature may from time to time determine.” (NY Const, art XVII, § 1.)
Section 131-a of the Social Services Law, here under attack, sets forth a "standard of need” based upon the number of *239 needy persons in the applicant’s household. As explained by the Court of Appeals in Baumes v Lavine (38 NY2d 296, 305), the last occasion when the Legislature raised the benefit levels "to reflect changes in the cost of living” was effective January 1, 1974. At that time the levels set by law were found by the Legislature to constitute a minimum subsistence standard. It is contended in the affidavits in opposition to this dismissal motion of David M. Gordon, professor of economics at the New School of Social Research, Bruce C. Ratner, Commissioner of the New York City Department of Consumer Affairs, Mitchell I. Ginsberg, presently Dean of the Columbia School of Social Work and formerly administrator of the New York City Human Resources Administration, and others, that although welfare benefits have been increased by 11% in the past decade, the cost of essential items of need has risen almost 90% in the same period. These calculations are described as a "statistical slight [sic] of hand” in the supporting affidavit of Sydelle S. Shapiro, Deputy Commissioner of the Department of Social Services, and as making "a dramatic claim that is without substance.” This court need not settle this war of numbers, inasmuch as it reluctantly finds the action to rest entirely on nonjusticiable claims. It therefore cannot entertain the action (CPLR 3001).
II.
The starting point for any constitutional question must be the language of the Constitution itself (People v Carroll, 3 NY2d 686, 689). The text of article XVII fixes a duty upon the State to provide for the care of the needy as a public concern, but "in such manner and by such means, as the legislature may from time to time determine. ” (Emphasis added.) While the Legislature may not evade its duty in this area of "public concern”, the manner and means of discharge of that duty lie within the broadest legislative discretion. The discretionary quality of this constitutional provision may usefully be contrasted with the mandatory character of the education article of the Constitution: "The legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated.” (NY Const, art XI, § 1, emphasis added; cf. Board of Educ. v Nyquist, 94 Misc 2d 466.)
That the framers of article XVII intended to vest the broadest possible discretion in the Legislature with regard to *240 public assistance is indicated by the legislative history of the provision. The original draft of the section required the State to provide care and support "in such manner and by such means as will ensure maintenance to the inhabitants of this state.” (Proposed Amendments, 1938 New York State Constitutional Convention, Vol 1, No. 64; emphasis added.) This earlier formulation was rejected, and the transition of that mandatory phraseology into the present discretionary format is set forth in the Report of the Committee on Social Welfare as intending "to remove all doubt as to the power of the Legislature to authorize relief for those in need and to allocate responsibility therefor to the State and its political subdivisions” (1938 New York State Constitutional Convention Revised Record, Vol 2, p 1085; emphasis added.)
In construing article XVII our highest court has said: "In New York State, the provision for assistance to the needy is not a matter of legislative grace; rather, it is specifically mandated by our Constitution” (Tucker v Toia, 43 NY2d 1, 7). However in Matter of Bernstein v Toia (43 NY2d 437, 449), the same court refined that observation: "We explicitly recognized in Tucker that the Legislature is vested with discretion to determine the amount of aid; what we held there prohibited was the Legislature’s 'simply refusing to aid those whom it classified as needy’ ”.
Thus it is clear that prior judicial construction of the clear meaning of the Constitution now prevents a court from substituting its judgment for that of the Legislature in welfare matters. The writ of any New York court cannot be made to run that far.
It is true, of course, that the judicial power has had its proper exercise in welfare questions. The courts will strike down any arbitrary legislative classification which denies to one class of needy persons public assistance which is available to all others (Matter of Lee v Smith, 43 NY2d 453). But what the courts cannot do, with a proper deference for and recognition of the doctrine of separation of powers, is to dictate the allocation of public resources and a wholesale reordering of public priorities (Jones v Beame, 45 NY2d 402).
III.
Plaintiffs’ secondary reliance on a Federal constitutional claim will not sustain this complaint. The uniform flat grant system (the grant maxima concept) of section 131-a of the *241 Social Services Law has been sustained by the United States Supreme Court in Rosado v Wyman (397 US 397, 419) (the elimination of special grants was held violative of the Social Security Act and section 131-a was thereafter amended to provide for special needs). In Dandridge v Williams (397 US 471, 487), the Supreme Court held that a Maryland statute under which some large families received less than the State declared standard of need was no denial of equal protection under the Fourteenth Amendment, and that the United States Constitution "does not empower this Court to second-guess state officials charged with the difficult responsibility of allocating limited public welfare funds among the myriad of potential recipients.” The Supreme Court has further held (Jefferson v Hackney, 406 US 535) that although the Social Security Act (US Code, tit 42, § 602, subd [a], par [23]) may require States to make cost of living adjustments in the standard of need, the Federal Constitution does not require the States to pay the full amount of that standard of need.
IV.
Furthermore, the nonjusticiability of this action is manifest when attention is focused upon the relief sought. The action sounds primarily in declaratory relief, and there is considerable doubt as to whether this remedy will lie against the State when its proprietary interests are involved (Niagara Falls Power Co. v White, 292 NY 472; Hunterfly Realty Corp. v State of New York, 62 Misc 2d 567). In the Niagara Falls case the Court of Appeals held that a declaratory judgment was not available to declare a section of the Conservation Law unconstitutional insofar as it permitted the State to charge a rental for diversion of the Niagara River. The loss of such rentals would be miniscule compared with the impact on State revenues sought by the complaint herein.
Here the mere declaration of rights is just the first step. If the court should declare section 131-a unconstitutional, the defendant commissioner must then see to it that payments are increased to whatever level the court finds to be constitutionally acceptable. If the court should so enjoin the commissioner, upon pain of contempt for noncompliance, her answer must be that she has insufficient funds at hand to satisfy the rights declared. Is the next escalation of court action to be an order to the Governor to convene a special session of the Legislature, followed perhaps by order to the legislators them *242 selves as to draftsmanship of the law and their affirmative votes thereon? Clearly, an effective judgment in this action would require a chaotic finale — the complete breakdown of the separation of powers as hitherto known in Anglo-American law.
Finally, the continued maintenance of this action may well work a sad illusion upon the very class which plaintiffs would purport to represent — all of the welfare recipients of this State. As long as this lawsuit were to pend undetermined in the courts, it would provide a complacent refuge for legislative inaction. The power to help the needy in this State is ultimately derived from the conscience of the People as expressed through their elected representatives. From what appears in the record before this court that conscience has been too long asleep; the result has been a frightful cost in twisted lives and shattered hopes.
Yet the cure for this great social malaise is not to come from the hands of Judges, who cannot be viewed as a super Legislature of platonic guardians vested with either the power or the wisdom to manage the vast lawmaking enterprise that this action would invite. Tempting as the invitation may be, the Judge would do well to remember the words of Learned Hand in his essay on moderation: "that a society so riven that the spirit of moderation is gone, no court can save; that a society where that spirit flourishes, no court need save; that in a society which evades its responsibility by thrusting upon courts the nurture of that spirit, that spirit in the end will perish.” (Emphasis in original.) It is also worth recalling that Judge Hand defined moderation in a way that is central to the quest for justice by the plaintiffs here: "faith in the sacredness of the individual.”
Accordingly, defendant’s motion to dismiss the action is in all respects granted. Plaintiffs’ companion motion for a declaration of class action status (CPLR art 9) is dismissed as moot.